# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2019-0737, <u>State of New Hampshire v. Mark Heath</u>, the court on November 16, 2021, issued the following order:**

Having considered the briefs and oral arguments of the parties, we conclude that a formal written opinion is unnecessary in this case.  The defendant, Mark Heath, appeals his conviction, following a jury trial in the Superior Court (<u>Nicolosi</u>, J.), on one count of second degree murder.  <u>See</u> RSA 630:1-b, I(b) (2016).  The defendant argues on appeal that the trial court erred by: (1) admitting evidence of the defendant's inconsistent statements concerning his prior animal-cruelty conviction; and (2) precluding the defendant from cross-examining the victim's mother about her prior statements regarding her use of makeup on the victim and involvement in the defendant's marijuana enterprise.  We conclude that, even assuming that the trial court erred with respect to either or both of the evidentiary rulings challenged on appeal, the errors did not affect the verdict.  Therefore, we affirm the defendant's conviction because any error was harmless beyond a reasonable doubt.

The jury could have found the following facts.  In December 2017, the defendant lived in an apartment with his girlfriend and her two sons: the victim, age two; and the victim's older brother, age five.  The victim's mother had recently separated from her husband, her two sons' biological father, who lived in an apartment upstairs with his uncle.

On December 11, 2017, the victim's mother awoke at 7:30 a.m. and drove her older son to school.  She then briefly returned to the apartment, checked in on the victim, and left for work at 8:40 a.m., arriving shortly before 9:00 a.m.  Thereafter, only the defendant and the victim remained in the apartment.  At 10:17 a.m., the victim's mother received a text from the defendant with a picture of the victim lying on his bed amidst a bowl of cereal, root beer, a mango, a fruit cup, and a sippy cup — all of which the victim had taken from the kitchen and spread out on his bed.[1]  The caption to the text from the defendant read: "I fell back asleep, woke up to take a piss, and this is what [the victim's] bed looks like."  After sending the text and image, the

---

[1] A later search of the defendant's phone verified that the picture was created and sent at 10:17 a.m.

defendant observed the victim "eating away" and noticed he spilled cereal on his bed. While cleaning up the spill, the defendant also discovered that the victim had made a "mess" in his diaper, which the defendant then proceeded to change.

At approximately the same time, the victim's father and his uncle, who were upstairs in their apartment, heard a series of "loud bangs" come from the victim's room. The uncle stated the sound "shook the floor," as if "somebody had jumped off the bed and landed hard." Shortly thereafter, the defendant ran upstairs and knocked on the victim's father's door, asking for help because the victim was not breathing. The victim's father rushed downstairs, found the victim unresponsive on his bed, and carried the victim up to the third floor, where he performed CPR and instructed the defendant to call 911. The defendant made the call at 11:19 a.m. and emergency responders arrived approximately four minutes later.

When emergency responders arrived, the victim was unresponsive, with no pulse, and although his airway was unobstructed, he was not breathing. The emergency responders also observed significant bruising to his face, torso, and extremities. The victim was transported to the hospital where he was pronounced dead.

An autopsy revealed that the victim's death was caused by blunt impact injuries to his abdomen, resulting in severe internal bleeding. Based on the severity of the internal injuries and the significant bruising to the victim, the medical examiner concluded that the manner of death was a homicide. Police subsequently arrested the defendant after finding him hiding in the basement of his mother's house. The State charged the defendant with two alternative-theory counts of second degree murder, one count alleging the defendant recklessly caused the victim's death with extreme indifference to human life and the other alleging the same conduct with a knowing state of mind. See RSA 630:1-b, I (2016).

During the ensuing investigation, the police asked the victim's mother about the defendant's use and sale of marijuana. Initially, the victim's mother admitted to being minimally involved with the defendant's marijuana sales, claiming to have spoken to a friend about the defendant's sales on just one occasion. However, at a later evidentiary hearing, when confronted with a series of messages, the victim's mother admitted to attempting to sell the defendant's marijuana to multiple friends. Citing, among others, New Hampshire Rules of Evidence 403 and 404(b), the State filed a motion in limine to exclude evidence of the victim's mother's prior statements about selling marijuana. The defendant objected, arguing that the statements were inconsistent and therefore relevant to the victim's mother's credibility and

2

consciousness of guilt. The trial court granted the motion, finding that the probative value of the evidence was "not terribly great" because it related to a collateral matter and was substantially outweighed by the danger of unfair prejudice that "the jury may develop an improper bias against the witness because of her bad acts."

Prior to trial, the defendant moved in limine to preclude evidence of his statements to police concerning his fifteen-year-old animal-cruelty conviction. Specifically, during an interview with police, when asked about the prior conviction, the defendant denied responsibility for the underlying offense of killing a cat, instead claiming that he took the "fall" for someone else. The State objected to the defendant's motion, arguing that the defendant's statements were relevant to attack his credibility and show consciousness of guilt. The trial court initially determined the evidence was inadmissible under Rule 403, reasoning, in part, that the defendant did not "provide misinformation or overtly lie, conduct which would have had substantially more probative value." The trial court further determined that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice from the jury hearing evidence of a prior bad act.

The State moved for reconsideration, citing new evidence that, while the defendant's motion was pending, he stated during a jail telephone call that he once killed a cat, but did so only in self-defense. The trial court granted the motion for reconsideration, reasoning that, in light of the defendant's subsequent inconsistent statement, the "relative clarity of the lie" increases "the probative value of this evidence exponentially" towards both the defendant's consciousness of guilt and credibility. The trial court reasoned that "in light of the centrality" of those issues in the case, the probative value of the evidence substantially outweighed any danger of unfair prejudice. Accordingly, although the defendant did not testify at trial and evidence of the conviction was not admitted, the State introduced evidence of the defendant's inconsistent statements surrounding the prior conviction through tape recordings and a detective's testimony.

Later, at trial, the defendant sought to introduce evidence of an October 2017 text message from the victim's mother to the defendant, which stated: "If I have to, I'll put makeup on him, and we can bring him in," in response to the defendant informing the mother that the victim had hurt himself falling off his bed. When confronted with evidence of this message at an evidentiary hearing, the victim's mother responded that she only offered to put makeup on the victim because it was Halloween. In light of this prior statement, as well as others downplaying her use of makeup on the victim, the defendant argued that the text message was relevant to the victim's mother's credibility and consciousness of guilt. The court ruled the evidence inadmissible under Rule

3

403, finding the statement "cumulative" and because the mother's efforts to explain "border[ed] on being nonsensical." After a six-day trial, the jury convicted the defendant of reckless, second degree murder and acquitted him on the alternate count. This appeal followed.

On appeal, the defendant argues that the trial court erred by: (1) admitting evidence of the defendant's inconsistent statements concerning his prior animal-cruelty conviction; and (2) precluding the defendant from cross-examining the victim's mother about her prior statements regarding marijuana sales and use of makeup on the victim. The State counters, in part, that even if the trial court erred in either regard, the defendant's conviction should be affirmed because any error was harmless beyond a reasonable doubt. Because we agree with the State, we need not address either of the defendant's arguments.

To establish harmless error, the State must prove beyond a reasonable doubt that the error did not affect the verdict. See State v. Papillon, 173 N.H. 13, 28 (2020). This standard applies to both the erroneous admission and exclusion of evidence. Id. An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. See id. at 28-29. In making this determination, we consider the alternative evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 29.

The defendant was convicted of reckless, second degree murder, which required the State to prove beyond a reasonable doubt that the defendant caused the death of another "recklessly under circumstances manifesting an extreme indifference to the value of human life." RSA 630:1-b, I(b). "A person acts recklessly with respect to a material element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." RSA 626:2, II(c) (2016). "The risk must be of such a nature and degree that, considering the circumstances known to him, its disregard constitutes a gross deviation from the conduct that a law-abiding person would observe in the situation." Id.

Here, there was overwhelming, alternative evidence of the defendant's guilt. Foremost, two medical experts opined that it was not possible for the victim's injuries to have occurred prior to the 10:17 a.m. photograph and text sent to the victim's mother by the defendant. Dr. Duval, the Chief Medical Examiner who performed the autopsy, explained that the victim suffered injuries consistent with a "focus[ed] blow right to . . . the abdomen that crushe[d] the intestine against the spine," causing the victim's intestine to tear

4

and, in the process, severing the major artery delivering blood to his digestive system. The severity of the injury was characterized as one typically seen in a "horrific" car accident and likely caused the victim to suffer immediate, excruciating pain. As a result, Duval opined that, given the victim's demeanor in the photograph and his prior actions seeking out food, "it's extremely unlikely that . . . those injuries had been inflicted prior to [the 10:17 a.m.] photograph"; Duval added that although "anything is possible," in this instance "[it] just would not make sense" for the injuries to have occurred prior to 10:17 a.m.

The second expert, a practicing pediatrician, was more emphatic. She testified that there is "no possibility that if [the victim] had already sustained this fatal beating where his intestines were torn apart and he was bleeding to death, he would have been able to go to the kitchen, get all this food, bring it back to his bed, and would have been eating." Furthermore, both experts testified that it was unlikely the victim would have been capable of producing a bowel movement after the injury. Moreover, the first responders, a trauma nurse, and the autopsy report all described significant bruising to the victim's face that is not apparent in the 10:17 a.m. photograph, and both the victim's father and his uncle heard a series of loud noises from the victim's room at approximately the same time. The evidence is also uncontroverted that the defendant was alone in the apartment with the victim from 8:40 a.m., when the victim's mother left for work, to until shortly after 11:00 a.m., when the defendant sought aid for the victim's injury. Therefore, we conclude that the State presented overwhelming, alternative evidence for the jury to find beyond a reasonable doubt that the defendant alone had the opportunity to inflict the fatal injuries to the victim, and by extension to find the defendant guilty.

Against this overwhelming evidence of the defendant's guilt, the defendant's inconsistent statements concerning his prior conviction were cumulative in light of the other evidence concerning the defendant's prior conduct and character. See Papillon, 173 N.H. at 28-29. The jury heard evidence that the defendant previously used physical discipline on the victim, in one instance smacking his behind and leaving a mark with his fingers. Furthermore, the record includes evidence that the defendant regularly used marijuana to manage his emotions. During an interview with police, the defendant offered that he did not "like being around people" and frequently used marijuana to "self-medicate" his frustrations. Significantly, the defendant also admitted that he had run out of marijuana on the day of the offense. The jury also heard evidence that changing diapers was a triggering event for the defendant. By way of example, when asked by the police about changing the victim's diaper, the defendant launched an expletive-filled rant, describing his disgust with the mess in the victim's diaper. In fact, when the defendant was

5

left alone with the victim on a prior occasion, the defendant refused to change the victim's diaper and, instead, texted the victim's mother asking her to return home to do it.

The defendant's inconsistent statements concerning his prior conviction were also cumulative of other evidence demonstrating his consciousness of guilt. For instance, the jury heard evidence that the defendant hid in his mother's basement when he learned that the police were looking for him and, once in custody, threatened to commit suicide multiple times. See State v. Colbath, 171 N.H. 626, 638 (2019) (holding that flight and threats to commit suicide are evidence of consciousness of guilt). The jury also heard evidence that, as the investigation progressed, the defendant provided inconsistent explanations as to the cause of the victim's injuries. For example, on the day of the incident, the jury could have found that the defendant told first responders that the victim ate yogurt and stopped breathing. Later, during an interview with police, the defendant insinuated that the victim's bruising, and by extension his fatal internal injuries, were inflicted by the victim's older brother when he allegedly jumped down onto the victim from the top bunk. See State v. Bean, 153 N.H. 380, 387 (2006) (concluding that the defendant's "varying explanations for his presence" at the scene evidenced his consciousness of guilt).

Additionally, to the extent that the trial court erred by prohibiting the defendant from questioning the victim's mother about her prior inconsistent statements in order to attack her credibility and demonstrate her consciousness of guilt, we agree with the State that any error was harmless beyond a reasonable doubt. This evidence was cumulative of other evidence offered for the same purpose. For example, the defendant questioned the victim's mother about the criminal complaint issued against her for endangering the victim's welfare by neglecting to seek medical attention for a prior injury, and about certain benefits she received with respect to that charge in exchange for cooperating with the State's investigation of the defendant. The jury also heard evidence of the victim's mother's inconsistent statements concerning: (1) her use of discipline on the children; (2) her timeline of events on the morning of the incident; (3) her divergent explanations of the source of the victim's fatal injuries; and (4) the cause for the presence of the Division for Children, Youth and Families in her life.

Finally, in presenting overwhelming evidence of the defendant's guilt, the State relied primarily upon the testimony of medical experts as well as the defendant's admissions during his interview with law enforcement. Therefore, the victim's mother's prior inconsistent statements, which the trial court deemed inadmissible, did not rebut, and thus were inconsequential to, the other overwhelming evidence presented to the jury demonstrating that the

6

defendant alone had the opportunity to inflict the fatal injuries on the victim. Accordingly, after reviewing the record in its entirety, we conclude that the State has met its burden of proving that any alleged error did not affect the verdict, and was, therefore, harmless beyond a reasonable doubt.

Affirmed.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,
Clerk**